In the matter of the Application of **DANIEL MOORE**:

For an order for the return to Zimbabwe of **LIBBY JOAN MOORE** pursuant to the Provisions of the Hague Convention on the Civil Aspects of International Child Abduction

---

### AFFIDAVIT BY DANIEL MOORE

---

I, **DANIEL MOORE**, do hereby make oath and swear that: -

1. I am the Applicant in this matter and I reside in Zimbabwe at 519, Reynard Road, Victoria Falls, Zimbabwe. I was born Harare, Zimbabwe, on 12th May 1982 and I have, to all intents and purposes, lived in Zimbabwe for my entire life. I am a professional hunter by occupation, and this leads me to undertake safari and hunting operations in countries within the region, principally Tanzania and Cameroon.

2. The Respondent in this matter is **VICTORIA ASHTON MOORE (nee Angelo)** who is my wife. My wife was born in New York, New York State, United States of America on 15th November 1989 and is a teacher by occupation. My wife formerly resided together with me in the matrimonial home in Reynard Road in Victoria Falls where I still reside, until her sudden departure together with our minor child (about whom more is said below) in December last year in circumstances outlined hereunder.
I verify believe that the Respondent is resident somewhere in either New York or in New Jersey but I do not have her address and she refuses to disclose it contenting herself with directing me to send anything that requires delivery to her parents' address in New York.

3. I am, by automatic operation of law, domiciled in Zimbabwe and I regard Zimbabwe as my permanent home.

1

4. The Respondent, after graduation from her college education in the United States of America, travelled to Africa and I met her in Arusha in Tanzania. We began courting very shortly after we met and we courted for a period of approximately 6 years and during which period we lived together in Tanzania, albeit regularly visiting Victoria Falls to see family and for her to meet my friends and community in Victoria Falls. Ultimately in or about March 2019 she moved with me to Victoria Falls and where we set up home together in my home aforesaid during March 2019.

5. I and the Respondent had married each other a few months earlier in terms of the Marriage Act (Chapter 5:13) in Victoria Falls on 11th December 2018 and we are still so married. I attach hereto a copy of the Marriage Certificate handed to us at the time of our marriage, marked **annexure "A"**.

6. On 21st May 2019, in Bulawayo, Zimbabwe, our daughter, namely **LIBBY JOAN MOORE** was born to us. Hereinafter I shall refer to our daughter as "**LIBBY**". I attach hereto, marked **annexure "B"**, the American birth certificate of my daughter issued to us by the United States Embassy in Harare. The Respondent has the Zimbabwe birth certificate of Libby having taken it with her, together with many other of our important documents when she departed from Zimbabwe in December 2021.

7. Regrettably the marriage between myself and my wife, the Respondent, suffered a number of unhappy episodes, and which resulted in a number of frequently abusive and offensive arguments between us and during many of which the Respondent, normally in the most foul and abusive language, declared that she wanted a divorce. The Respondent seems to feel that I have not been emotionally available to her and appreciative of what she considers to be the sacrifices she has made for me. I found myself constantly met with angry remarks and constant contempt and ridicule. It seemed clear from fairly early on in our marriage that the Respondent had lost all love and respect for me. That said, we did agree that we would like to have another child. I did advise my wife, however, that before we tried for another child we should try to mend our relationship. This appeared to be the last straw for her, and she became, once

again, enraged and demanded that we divorce. Our relationship, sadly, was toxic and trying from fairly early on in the marriage and we did have therapy on and off pretty much from the time Libby was born and the Respondent was diagnosed with postpartum depression.

8. Because the atmosphere within the home was toxic and which could potentially adversely affect Libby, I agreed to depart from the marital home during October and moved into my cottage situate elsewhere in Victoria Falls and, occasionally, also lived in my father's house which was closer to the matrimonial home and, effectively, we set up a trial separation arrangement. However, we both continued to enjoy equal custody of and access to Libby pursuant to an arrangement whereby each of us would alternate 2 to 3 nights with Libby in our respective homes, the Respondent remaining in the marital home together with Libby and me having Libby in the cottage to which I had moved. During the periods that I had Libby I would be, to all intents and purposes, a single father from the time that I collected her from her mother and took her to my home. I would arrange all meals and food at meal times I would take her to school and return her home, take he to her "play dates" and generally fully care for her in every way before I then returned her to her mother for her mother's period of time with her. To all intents and purposes, we shared Libby between us and effectively enjoyed joint custody of Libby from the time that I had departed the marital home. During this period, I did have a hunt from latter part of October to early November for a period of approximately 2 and a half weeks. Furthermore, there was one occasion when Respondent went on holiday for a week and on that occasion, I moved back into my home and exercised custody of Libby there for a week.

9. In earlyish December 2021 I received a message from google that a foreign device had logged into my email account which I subsequently learned was my wife, the Respondent, hacking into my emails. I challenged her and she initially denied having done so, albeit very shortly thereafter letting it slip that she had done so. She subsequently advised me that she wished to take Libby to America for the Christmas holiday.

3

10. During December I and Respondent discussed ancillary aspects pertaining to a pending divorce, the Respondent being adamant that she and I should divorce. Incorporated within what we discussed was, as indicated above, that she would remain within the marital home with Libby, and that all pets would remain within the marital home together with her and Libby and that I should pay a minimum of USD$1500.00 per month as my contribution for payment of general household bills and living costs and that if I failed to pay at least that amount per month then she would make arrangements to return to America. Indeed, shortly after I did vacate the marital home the Respondent procured to furnish to me a form of separation agreement. The Respondent, by now, had acquired a junior school in Victoria Falls which she ran as a business and at which she was the Headmistress and which, as I understood it, provided her with meaningful revenues monthly.

11. The arrangements between us incorporating our joint custody periods with Libby seemed to me to be working well and I very much enjoyed my periods with Libby.

12. On the evening of Saturday 18th December last year, I received a Whatsapp call from the Respondent informing me that she had boarded an aircraft at the airport (Victoria Falls International Airport) together with Libby and that she was flying to New York with Libby. This was the first intimation to me of the Respondent taking Libby from Zimbabwe. She had, approximately a week or so earlier, informed me that she wished to spend the Christmas holidays in New York and whether that was in order, and I had advised her that it was not in order because I wished to spend Christmas with Libby in Zimbabwe. I indicated that immediately after the Christmas holiday I was committed to a hunt and that she could then take Libby with her to New York to spend time with her family there.

13. As stated above, I had not been made aware in advance of the Respondent's intention to take Libby to America, and I was gutted by the news. Immediately after having received the call, I received a Whatsapp message from Respondent

4

to the effect that she was truly sorry but that she and Libby were on their way to New York to be with her family and that she was not doing well being "stuck" in Zimbabwe and that Libby was suffering because she, Respondent, was suffering, and apologizing for the fact that protecting herself and her mental stability meant that I would not be able to see my daughter on Christmas. She went on to state that I was a great dad and that she was very sorry that "……it has to be this way…". I attach hereto marked **annexure "C"**, the entirety of the lengthy Whatsapp message that I received.

14. Clearly the removal from Zimbabwe of my daughter without prior notice and without my prior knowledge, let alone consent, is wrongful and is a clear and obvious breach of the provisions of Article 3 (a) of the Convention on the Civil Aspects of International Child Abduction which was signed at the Hague on the 25th October 1980 (hereinafter referred to as "the Convention"). Given that at the time of such removal I and my wife had been in every respect exercising joint custody of Libby and living in fairly close proximity to one another in Victoria Falls. I and the Respondent were exercising our rights of custody jointly at all material times, and but for the wrongful removal from Zimbabwe of Libby I would be continuing to exercise such rights of custody.

15. It will be noted, in particular, that the Respondent does, in her Whatsapp message, **annexure "C"** hereto, state that she and Libby have return tickets for the following month, January 2022 and that she was not relocating to the United States, but simply visiting her family for 3 weeks. The allegation that I threatened to put the Respondent in jail is false and I deny it. I have at no stage threatened her. All I did was point out to her that her hacking of my electronic devices, and in particular my computer constituted a criminal offence with serious potential penalties, and which could include incarceration, so she should not do it. I did not, in any way, indicate to her that I would take this aspect any further. Indeed, I have clearly informed her I would not be taking it further.

16. From the time of Libby's removal from me I have been trying to have contact with her via her mother and which was initially, for about 3 months or so,

5

permitted to me .I have explained to her that with my work commitments, and which necessarily take me to safari hunting areas where, more often than not, there is simply no Wi-Fi or other digital communication signal capacity, I am very much hamstrung and accordingly restricted as to opportunities where I am capacitated to be able to speak to my daughter and see her on Facetime or Video link on those occasions where this has been permitted by her mother.

17. With immediate effect after her departure from Zimbabwe I did commence monthly financial contributions to the Respondent but, within little more than 2 weeks or so after departing, her mother's demands for me to pay very significantly in excess of the average monthly amount that I had been paying for my daughter's welfare, being an average of USD$1 500.00 monthly, become significantly more strident and demanding and contemptuous of what she considered to be the hugely inadequate financial contribution that I was making. But such contribution is, by reference to my own earning from my occupation as a professional hunter, as much as I am able to afford.

18. Then on 27th January I received a bombshell Whatsapp from the Respondent which reads as follows: -

"After a lot of thought, reflection and consideration I have made the decision to permanently move back to New York. I am going to put a Head in charge or sell the school. Support is the most important thing right now. Is Harley staying at the house? Does he need to? I need to have the dogs watched so I would like Gloria to stay, but if you want rent or whatever the dogs need to be sorted before I have made a plan for them. I would appreciate your help with that. I have also been advised to not leave the country until a legal Court ordered custody arrangement has been put in place or the divorce is finalized. I am waiting for responses from my lawyer; however, you seem to be further along sothe sooner that's addressed the better. Since we are both out of country, I believe we need to file a document requesting it gets processed without us in country. If this is not finalized by the time you have a break in your hunts, youare welcome to

come see Libby in New York. However, I do not feel safe nor comfortable travelling to Zimbabwe without knowing the official arrangement of my daughter."

(The reference to "Harley" in this Whatsapp is a reference to a relative of mine who, when I am away from my home and given that there is now no presence there of my wife, I ask to stay at my home as a house sitter and to supervise the home and to attend to looking after the pets that still live there).

I attach a copy of the Whatsapp message as **annexure "D"**.

19. Subsequently the Respondent did indicate that she was considering returning to Zimbabwe sometime in March during the course of a discussion with me and during which discussion she did mention that she had obtained legal representation in America.

20. Two days after receiving the Respondent's notification as set out in **annexure "D"** above, I addressed an email to her on Saturday 29th January as follows: -

    "Please would you come back to Zim on dates you said you would, im begging you. i really want to see Libby. i have given no reason in the past for you to think there is a safety issue. i fly back to Cameroon end March beginning April. i have nothing up my sleeve a assure you i just want to see Libby. i want our divorce handled amicably as i have said many times before. Please consider this for me. Thanks. Dan".

    I attach hereto the said Whatsapp communication dated 29th January 2022 marked **annexure "E"**.

21. On 16th March 2022 I sent to the Respondent an email which reads as follows:-

    "i will consistently pay what is affordable due to my earning capacity. i earn an inconsistent amount of money and i earn an African salary. These are not viable amounts for me to send to you every month based on what i earn. If youwould like me to take some time away to look after Libby while you find your feetin New

York to be able to support the lifestyle you desire i have no hesitation and will do so happily. Please in the meantime could you return Libby to her country of birth that she was taken away from illegally and without consent fromme. And when our divorce is finalized we can both maneuver within our respective boundaries set by the law. Please can you advise me without delaywhen you will be returning with Libby to Zimbabwe as the previous dates you setyou never stuck to."

I attach hereto the said email communication dated 16th March 2022 and which reflects the Respondent's unhelpful contemptuous response and my follow-up request that Respondent unblock me so as to enable me to telephone my daughter, marked **annexure "F"**.

22. On 16th March 2022 I addressed a Whatsapp to Respondent inquiring as to whether she had received my email of the same date (i.e. the one referred to in para 21 above) and on the following day I sent her a Whatsapp asking to speak to Libby if she is available. I received no response and I again addressed Respondent by Whatsapp on Saturday 17th March asking her to let me know when I could chat again. Then on Sunday 18th March I received a series of Whatsapp communications from the Respondent to some of which I did reply. The reality is that I was refused permission to speak to my daughter. I attach hereto, marked **annexure "G"** the Whatsapp string between myself and the Respondent between the period 16th to 18th March.

23. I make the point, again that the Respondent's actions in deliberately continuing to retain our daughter in America seemingly with no intention of returning her to Zimbabwe is, again, wrongful and a clear breach of the provisions of Article 3 of the said Convention. I wish to strongly make the point at this juncture, here and now, that the most precious thing in the world to me is that I have a meaningful, loving and committed relationship with my daughter Libby, which will necessarily include regular communication with her, and as many periods of extended physical access as possible wherever practicable and affordable. Indeed, I am

considering a possibility of venturing into an alternative career which would obviate me having to be absent for extended periods of time whilst on hunting safaris in other countries than the country in which I live and where I am domiciled, being Zimbabwe.

24. Clearly the fact that the Respondent considers that I am paying an insufficient amount of financial support for my daughter in America is not germane or any valid legal basis for Respondent to have wrongfully removed Libby from her country of habitual residence, the country in which she was born and has lived all her life until she was wrongfully removed, and to continue to retain her from me, notwithstanding her initial undertakings to return with Libby during the early course of this year. What I respectfully seek from the Courts of the country to which Libby has been wrongfully removed, and in which she continues to be wrongfully retained, is an Order compelling Respondent to procure the return to Zimbabwe of Libby without unnecessary delay and where the matter of the custody of Libby and the entitlement of Libby and myself for Libby to have a meaningful and loving committed relationship with me will be determined either pursuant to the judicial proceedings which I have already instituted in Zimbabwe in terms of a divorce action dated 21st April 2022 (but which papers I have not yet been able to serve upon the Respondent), or in such other manner as is wholly consistent with law.

25. It is clear to me that the Respondent now has no intention of returning with Libby to Zimbabwe, and most certainly no intention of procuring the return to Zimbabwe of Libby without her. In this regard I attach hereto, marked **annexure "H"** an earlier email string between myself and the Respondent on 2nd March and the contents of which are self-explanatory. The Respondent's contempt and insults and abusive language only gets worse in its offensiveness and egregiousness. There can be little doubt that she will be emotionally manipulating our daughter against me from this very early age and which is desperately distressing and manifestly against our daughter's best interests. I reiterate that Libby has a legal, constitutional and internationally recognized right and entitlement to the benefits and joys of being cared for and mentored by a

9

loving and caring and committed father as well as by her mother. And yet almost immediately after receipt of my email to her dated 16th March (**annexure"F"** aforesaid) the Respondent has **TOTALLY** blocked me from any form of communication with Libby. The last occasion on which I was permitted to speak to Libby was on or about 30th or 31st March. I did send out messages to her father very courteously requesting him to ask his daughter to reconsider her stance but she continues to fail to allow me to have regular communication with Libby in terms of an agreed and acceptable programme.

26. At or about the end of March I received Whatsapp communications from Respondent declaring positively that she is not returning to Zimbabwe and falsely claiming the reason as being that I am threatening her. I attach hereto, marked Annexure "I", the Whatsapp string between myself and the Respondent. The final page of that Whatsapp string will be noted refers to Gloria, Gloria being our domestic worker in the marital home, and which is a message by the Respondent to Gloria, and which Gloria in turn imaged to me, and where Respondent makes it clear again that she is not returning to Zimbabwe.

27. I continued, generally unsuccessfully, to beg, plead and implore Respondent to allow me to have communication with our daughter. I also continued to address her father in a desperate attempt to seek his intervention, as indicated previously in this affidavit, and my efforts thus far have proved unsuccessful. Sometime in May I did receive a response from her father clearly stating that he cannot get involved in the dispute between myself and his daughter. I also received, shortly after hearing from her father, a Whatsapp communication from the Respondent to her entire family requesting that they block me and everyone she knows in Victoria Falls from communicating with her or any member of her family. I attach hereto the email string between myself and her father ("Dave") and a copy of her Whatsapp to her family Whatsapp group in which she requests that everyone remove and block me from every social media account of any family member. These enclosures are marked **annexure "J"** and **annexure "K"** respectively.

28. In order to establish that I do pay regularly to the welfare of my daughter I attach hereto marked **annexure "L"** proof of payment of the amount of USD$4 510.00 to the Respondent for the support of our daughter, being for the months up to and including August. I have, thus far, since Respondent departed from Zimbabwe paid in excess of USD$16 000.00.

29. I wish to place on record that many communications that I have received over the months since Respondent absconded from Zimbabwe taking with her Libby, and all documentation pertaining to Libby, some of which, such as her Zimbabwean birth certificate are very important documents, Respondent has taken to sending very insulting and contemptuous and false allegations and information allegedly pertaining to me reflecting me as some kind of unfeeling narcissist and manipulative rogue who has no respect or consideration for anyone, including his family and his clients. Some examples of such behaviour is reflected in a number of the annexures to this affidavit. As has also been seen, some of these communication allege that I am no kind of father or healthy role model for our daughter. When the Respondent took to addressing third party hunting operators who employ me to undertake hunts on behalf of clients, and which would potentially prejudice my position with such persons and thus my capacity to be able to earn income, I considered that it was necessary to take action to regularize the record. Consequently I procured my legal practitioners in Harare Zimbabwe, to address a letter to the Respondent to warn her of the implications of such conduct and also to demand the return to Zimbabwe of Libby in order to avoid the need for the institution of a costly legal application for an order in the courts of the country to which Libby has been wrongfully removed by Respondent, to procure the return of our daughter to Zimbabwe. And also to advise the Respondent of the fact that I have already instituted legal proceedings claiming a decree of divorce and appropriate ancillary relief in the High Court of Zimbabwe, albeit that I have not yet been able to serve the papers on her.

I attach hereto, marked **annexure "M"** copy of the said letter dated 3rd June 2022 and which I furnished to her by email letter dated 6th June 2022 addressed to her email address. I attach hereto, marked **annexure "N"** a copy of the email

dated 6th June sending the letter, **annexure "M"** aforesaid, and the letter itself attached thereto. There has been no response whatever to the said letter – other than, possibly in a somewhat indirect manner, in that the Respondent has totally desisted from submitting any further scandalous and insulting material of me on Whatsapp or email or any other form of communication either to me, or so far as I am aware, to any third party with whom I have any form of acquaintanceship or relationship.

30. I respectfully submit that:-

   30.1. The removal from Zimbabwe, to all intents and purposes clandestinely, of Libby is wrongful in being a breach of Article 3 of the said Convention given that I was exercising custody rights over Libby at the time of such removal, and would continue to do so but for such removal;

   30.2. The continued retention by Respondent of Libby in the United States of America is wrongful in constituting a breach of Article 3 of the said Convention;

   30.3. The Respondent has clearly stated an intention and, by her conduct embarked upon implementation of such intention, namely to remove Libby entirely from my life, declaring that she needs to protect her from me and my family, and which has included blocking on her communication devices me and my family and my friends and my associates in Victoria Falls, and encouraging every member of her family to do likewise;

   30.4. As I have already indicated earlier in this affidavit, I love and care deeply for my daughter and my fundamental desire in my life is for her and myself to enjoy a normal, loving and caring paternal relationship and which, in my respectful submission, is unarguably in her best interests. Indeed, even the Respondent herself admitted that I am "….a great dad" **(annexure "C"** infra) who loves and cares for his daughter and even undertaking to return her to Zimbabwe after a period of 3 weeks visitation

with her parents, before she, the Respondent, became fiercely and illogically and bewilderingly hateful of me.

31. In the premises I respectfully pray that the Honourable Court before which this respectful application is placed, praying for the immediate return of my daughter, Libby Joan Moore, to Zimbabwe, her country of habitual residence, grant an order against Respondent obliging her to forthwith return Libby to Zimbabwe, pursuant to the provisions of Article 11 and Article 12 of the said Convention.

32. I continue to reside in my stated home address in Victoria Falls, and which is "house sit" for me, as appears above, while I am away conducting contracted hunting safaris.
I shall ensure, however, once I know that my daughter is coming home, that I am home with her and that I fully and responsibly take care of her and ensure that she is fully secure, safe and happy, with all her needs fully attended to.

33. Very recently, I have been permitted to speak with Libby twice per week for approximately 15 minutes each time, albeit under supervision, pursuant, I understand, to an Order granted by a Court in America. I am happy to have this opportunity to speak to my daughter, although I confess to feeling somewhat like a prisoner who is permitted telephone access with a family member twice a week. I strongly resent the fact that such calls need to be under supervision as though I am a prisoner subject to the authority of a prison officer.

34. I close in repeating my prayer to the Court as set out in paragraph 31 above.

Dated and signed at Arusha, Tanzania this 15Th day of **September, 2022.**

_____
**DANIEL MOORE**

## VERIFICATION

**I, DANIEL MOORE**, do hereby verify and state that what is written in paragraphs 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33 and 734are true to the best of my knowledge and believe.

Verified at Arusha, Tanzania this **15Th** day of **September, 2022.**

_____
**DANIEL MOORE**

**SWORN** and **DELIVERED** at **ARUSHA, TANZANIA**
by the said
**DANIEL MOORE**
Who is known to me personally; in my presence
This **15Th** day of **September, 2022.**

_____
**DEPONENT**

**BEFORE ME:**

Name: **SHEDRACK BONIFACE MOFULU**
Signature:..................................
Address: **P.O. BOX 15376, ARUSHA – TANZANIA**
Qualification: **ADVOCATE/COMMISSIONER FOR OATHS.**